# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| PENNY NIELSEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:15-cv-01653-SGC |
| | ) | |
| TALLADEGA COLLEGE, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION[1]

Presently pending is the motion for summary judgment filed by Defendant
Talladega College. (Doc. 23). Plaintiff Penny Nielson has responded, and
Defendant has replied. (Docs. 30, 31). Accordingly, this matter is fully briefed
and is ripe for adjudication. For the reasons that follow, the motion will be granted
in its entirety.

## I. FACTS

Plaintiff, who has "an earned doctorate in curriculum and instruction –
reading," was a faculty member at numerous colleges and universities between
1971 and 2013. (Doc. 30-1 at 1-2). Talladega College is a private liberal arts
college and is the "oldest fully-accredited historically black private college in the
state of Alabama." (Doc. 24 at 2-3). During the time period relevant to this

---

[1] The parties have unanimously consented to magistrate judge jurisdiction pursuant to 28 U.S.C.
§ 636(c). (Doc. 10).

lawsuit: (1) Billy Hawkins was President; and (2) Lisa Long was the Provost and Vice-President of Academic Affairs. (Doc. 24 at 3).

On April 3, 2013, Long recommended hiring Plaintiff as a Reading Specialist in the College's Elementary Education/Special Education Collaborative Program.[2] (Doc. 25-4 at 7; *see* Doc. 24 at 4). On April 5, Hawkins issued a letter of employment to Plaintiff, confirming her employment as a Reading Specialist for the end of the 2012-13 academic year, effective April 8, 2013, to May 13, 2013. (Doc. 25-4 at 9; *see* Doc. 24 at 4). Plaintiff worked full-time for the College during this five-week period. (Doc. 24 at 4). On May 1, 2013, Hawkins issued another letter confirming Plaintiff's employment as a Reading Specialist for the 2013-14 academic year, effective August 13, 2013, to May 14, 2014. (Doc. 25-4 at 11; *see* Doc. 24 at 4-5). Both employment letters noted Plaintiff's employment was "at will" and could be terminated at any time, without cause or notice, and at the sole discretion of Talladega College. (Doc. 25-4 at 9, 11).

During the 2013-14 academic year, there were four faculty members in the Education Department: (1) Plaintiff; (2) Dionne Edison; (3) Lemanski Walker; and (4) Karen Petty. (Doc. 24 at 5). Edison was chair of the department and Plaintiff's immediate supervisor. (Doc. 24 at 6). Edison, Walker, and Petty are black; Plaintiff is white. (*Id.* at 1, 5). Petty was hired on November 1, 2013, but Plaintiff

_____

[2] Plaintiff had previously taught at the College from 1984 to 1985 and again from 2008 to 2009. (Doc. 24 at 3).

contends Petty did not teach any classes or do any other work in November or December 2013. (Doc. 30-1 at 4; *see* Doc. 24 at 5). Plaintiff contends Petty's hiring was improper because Plaintiff was scheduled to interview her prior to hiring; however, Petty was hired before the scheduled interview, which never took place. (Doc. 30-2 at 2). Plaintiff testified her education and experience was superior to that of her colleagues, including Edison. (Doc. 25-1 at 32). Plaintiff described Edison's and Petty's educational credentials as "pitiful" and noted she had vastly greater experience than Petty and Walker. (*Id.*). Plaintiff described her departmental colleagues variously as Talladega College's "black pet[s]," "little pets," or "little black people." (Doc. 25-1 at 17, 34, 36).

On September 17, 2013, Plaintiff reported in an email to Long that Edison had spoken to her inappropriately in the presence of students. (Doc. 25-1 at 44; *see* Doc. 24 at 7). The disturbance was triggered by a dispute regarding the deadline for students to register for fingerprinting (the "Fingerprint Confrontation"). (Doc. 25-1 at 44). Plaintiff's email complaint to Long does not include any reference to race, religion, or age. (*Id.*). Plaintiff reported Edison was loud and insulting and her behavior led students to drop Plaintiff's class. (Doc. 30-1 at 5).[3]

_____

[3] Plaintiff's opposition disputes that the email did not refer to race, age, or religion. (Doc. 30-1 at 5). In support of this contention, the opposition cites portions of Plaintiff's deposition in which she acknowledges Edison did not use any racially-charged language. Instead, Plaintiff testified she "fel[t] like" Edison used racially discriminatory language behind her back. (Doc. 25-1 at 18). Plaintiff also explains she considered Edison's actions to be racially motivated because she "was

On September 30, 2013, Plaintiff sent an email to Edison—with copies to Long and Walker—complaining about syllabi Edison had developed and required faculty to use (the "Syllabus Complaint"). (Doc. 24 at 7; Doc. 30-1 at 5).[4] In the email, Nielson states the syllabi are "not good," disorganized, and contain confusing assignments. (Doc. 25-1 at 45). Plaintiff further noted Edison refused to answer her students' questions regarding the syllabi and assignments. (*Id.*). As with the Fingerprint Confrontation, the email regarding the Syllabus Complaint does not explicitly contend the syllabi or Edison's actions were in any way discriminatory. (*Id.*). Plaintiff testified she considered Edison's refusal to answer her students' questions to be racially discriminatory because she believes Edison would have answered questions from a black professor's students. (*Id.* at 15).

The Education Department has a copier that can be used to scan and email documents to a list of programmed recipients. (Doc. 25-1at 13). Plaintiff testified Edison entered faculty members' names into the scanner; while Edison correctly entered the names of "all the blacks," she misspelled Plaintiff's name. (*Id.* at 14). Edison testified she did not intentionally misspell Plaintiff's name. (Doc. 25-3 at 19-20). When Plaintiff brought the misspelling to Edison's attention, Edison refused to fix it; Edison invited Plaintiff to fix the misspelling herself but did not

---

a black woman yelling at a white woman." (*Id.*). Nevertheless, Plaintiff's email regarding the Fingerprint Confrontation does not mention any racial, religious, or age-related complaints.

[4] Plaintiff avers students complained to her about the syllabi. (Doc. 30-2 at 2).

provide any instructions, explaining that she had quickly learned how to enter the names on the scanner. (Doc. 25-1 at 13; *see* Doc. 25-3 at 20). Plaintiff complained to Long regarding this incident (the "Scanner Misspelling"). (Doc. 25-1 at 13). Plaintiff testified she thought Edison purposefully misspelled her name as a form of racial discrimination because Edison was "very ugly" and "treated the blacks totally differently." (*Id.*).

Next, Plaintiff was disturbed by an incident in which Edison admitted to a student that Edison had Attention Deficit Disorder and did not take medication for the condition. (Doc. 25-1 at 17). Plaintiff complained to Long about the conversation and testified that Long took no action. (*Id.*). Plaintiff further testified that she considered this to be a "violation" (the "ADD Violation") because Long failed to "protect" Plaintiff. (*Id.*). Plaintiff does not explain her theory regarding what species of discriminatory animus motivated the ADD Violation, but she testified students were quitting the program because of Edison's non-medicated ADD. (*Id.*).

During the Fall 2013 semester, Edison received free posters and booklets entitled "The Way to Happiness." (Doc. 25-3 at 11; *see* Doc. 24 at 8). Edison testified she thought the principles espoused in the materials were positive and she

did not consider the information to be religious in nature. (Doc. 25-3 at 11).[5] Edison gave copies of the booklet to the Education Department faculty, including Plaintiff. (*Id.*; Doc. 25-1 at 20-21). Edison also gave the posters to another Talladega College employee who posted them in the student center, located in another campus building. (*See* Doc. 25-3 at 11; Doc. 25-1 at 21; Doc. 25-3 at 16). Plaintiff was upset by the materials, which were distributed by a group affiliated with the Church of Scientology. (Doc. 25-1 at 21). Edison testified that she is not a scientologist. (Doc. 25-3 at 18). Plaintiff never read the booklets because she didn't "want Scientology pushed down [her] throat." (Doc. 25-1 at 21). Approximately two or three weeks later, another employee told Edison that Plaintiff stated the materials were distributed by the Church of Scientology; the employee showed Edison the church's logo—a sunrise icon—on the materials. (Doc. 25-3 at 12; Doc. 30-1 at 17). Edison testified she subsequently approached Plaintiff, spoke to her about the matter, and then "left it alone." (Doc. 25-3 at 12). Meanwhile, Plaintiff testified that Edison was yelling during this confrontation and "berated" her for complaining about the materials. (Doc. 25-1 at 21). Plaintiff avers Edison continued distributing The Way to Happiness materials to students and that Long was aware of this. (Doc. 30-2 at 3). Plaintiff also testified she

---

[5] The only evidence on the record regarding the content of the materials is that they included messages like: "The way to happiness is to be honest, to be generous, to give a helping hand, don't lie, don't cheat, good hygiene." (Doc. 25-3 at 11).

interpreted Edison's behavior as "bragging that those Scientology posters are still posted on Talladega College campus." (Doc. 25-1 at 21).

On December 17, 2013, Plaintiff emailed Edison expressing concern with a portion of the curriculum for an educational psychology course to be taught during the following semester. (Doc. 25-1 at 45). Plaintiff took issue with the inclusion of an exercise called "Teaching Tolerance," which was provided on the Southern Poverty Law Center's ("SPLC") website. (*Id.*). Plaintiff noted the exercise required students to register with the SPLC, which Plaintiff described as a group "actively promoting the gay agenda." (*Id.*). Plaintiff noted her opposition to utilizing Teaching Tolerance; her concern was based on "requiring students to register at this website." (*Id.*).

Edison's December 19, 2013 response—on which Long was copied—began by quoting the College's non-discrimination policy, which prohibits discrimination on many bases, including sexual orientation, disability, or religion. (Doc. 25-1 at 45). Edison's response continued:

> This term you have expressed deep concerns about the Church of Scientology, what people eat, individuals with disabilities and now sexual orientation. In each instance I could not find where the information provided or the individual involved was at odds with the mission of this institution, the State standards or Alabama law.

(Doc. 25-1 at 45). Edison also noted she had not received any complaints regarding use of SPLC materials during the previous ten years. (*Id.*). Edison also

offered to print the exercise for Plaintiff, so she would not have to register with the SPLC, to the extent Plaintiff would be offended by directly accessing the SPLC materials; Edison extended the same offer regarding any students who had similar concerns. (*Id.*). The response also invited Plaintiff to propose other materials to substitute for Teaching Tolerance. (*Id.*). Edison's response concluded that she "appreciate[d Plaintiff's] willingness to share [her] concern." (*Id.*). Plaintiff and Edison subsequently met in Edison's office, where Edison accessed and performed the exercise with Plaintiff; Edison stated she was trying to be helpful since Plaintiff did not want to register on the SPLC website. (Doc. 25-3 at 19). Plaintiff considered this to be discriminatory and/or retaliatory. (Doc. 30-1 at 6; Doc. 30-2 at 3).

Plaintiff also testified about a number of incidents to support claims for a hostile work environment. While Plaintiff has abandoned her hostile work environment claims, she contends the underlying facts support her claims for discrimination and retaliation regarding her nonrenewal. (Doc. 30-1 at 22 nn.8-9). These incidents include that: (1) Edison would "talk over" her in meetings with Long (Doc. 25-1 at 29); (2) Edison sent email complaints to Long regarding Plaintiff (*id.*); (3) Edison told another employee she did not want to sit by Plaintiff at a departmental function (*id.* at 18); and (4) Long said she would have "to decide if she would let [Plaintiff] teach other people's children" (*id.* at 29). Plaintiff felt

these incidents were racially and religiously discriminatory because Edison and Long are black and Plaintiff is white. (Doc. 25-1 at 18, 29). Plaintiff also testified that, during Walker's interview, Edison stated "she wanted a black male." (Doc. 25-1 at 30).[6] Plaintiff also testified students' files were stored in Walker's office; Plaintiff needed access to the files for advising purposes. (*Id.*). Plaintiff did not have a key to Walker's office, and Edison refused to move the files to another location. (*Id.*). Plaintiff considered this to be a form of racial discrimination. (*Id.*).

As to religious discrimination, Plaintiff testified Edison knew she was a Seventh Day Adventist because Plaintiff told her sometime during the Spring of 2013. (Doc. 25-1 at 19). Edison responded by saying the Seventh Day Adventists she knew were vegetarians. (*Id.*). Edison testified she knew Plaintiff was a vegetarian because, during departmental functions where food was served, Plaintiff had said "meat defiles the body." (Doc. 25-3 at 12).[7]

In December 2013, Edison wrote Long a letter recommending Plaintiff's employment not be renewed for the following academic year. (Doc. 25-2 at 12; Doc. 25-3 at 6-7). Edison testified Plaintiff was not the right "fit" for the

---

[6] The timing of Walker's interview is not entirely clear. Plaintiff testified Walker was hired shortly after her in the Spring of 2013. (Doc. 25-1 at 34). Long testified Walker was hired on April 29, 2013. (Doc. 25-2 at 9). Accordingly, it appears Walker's interview occurred no later than the Spring of 2013.

[7] After learning Plaintiff was a vegetarian, Edison brought vegetarian options to departmental pot-luck events so Plaintiff would have something to eat. (Doc. 25-3 at 12).

Education Department. (*Id.* at 6). Edison testified she reached this conclusion based on her opinion that Plaintiff failed to follow direction and departmental standards, including: (1) refusal to make copies of a handbook for students; (2) failure to transport students to field experiences punctually; (3) tardiness; (4) an incident during which Plaintiff raised her voice to a student; and (5) failure to timely provide a math module to students (Doc. 25-3 at 7-11, 19). Plaintiff was never formally disciplined for these or any other incidents, and documentation of these incidents does not appear on the record. (*See* Doc. 30-1 at 14, 17). In response to Talladega College's proffered reasons for nonrenewal, Plaintiff disputes Edison's version of events regarding each of the incidents; Plaintiff contends she followed directions and departmental standards. (*See id.* at 7).

Long reviewed Edison's recommendation and, on February 25, 2014, wrote Hawkins a letter recommending Plaintiff's employment not be renewed for the 2014-15 academic year. (Doc. 25-4 at 13). Long testified she relied on Edison's recommendation,[8] her experiences attempting to resolve disputes involving Plaintiff, and negative feed-back in a student evaluation. (Doc. 25-2 at 40). Long testified Plaintiff demonstrated a lack of cooperation in adhering to syllabi and responding to supervisor directives. (*Id.*). In response, Plaintiff disputes that she failed to cooperate in any way or that any complaints about her were meritorious.

---

[8] Long further testified she gave Edison's recommendation "great weight." (Doc. 25-2 at 40-41).

(Doc. 30-1 at 8). In any event, on the same day he received Long's recommendation, Hawkins issued a letter to Plaintiff informing her that her employment would not be renewed for the following year. (Doc. 25-4 at 15). Long hand-delivered the nonrenewal letter to Plaintiff and told her to "have a nice day." (Doc. 30-1 at 21). Plaintiff felt Long's salutation "was racial." (*Id*.). The other Education Department faculty members were renewed for the following year.

On April 4, 2014, Edison prepared a faculty evaluation for Plaintiff, assigning her 77 points out of 100 possible points. (Doc. 25-1 at 46). Edison's observations included: "[p]eriodic conflicts on student issues," "limited attendance at institutional functions," and "periodic conflicts completing other duties as designated." (*Id.*). Plaintiff responded in her observations that the evaluation was incomplete and opined that Long and Edison applied a higher standard to Plaintiff while showing "favoritism toward others." (*Id.*). Edison testified that a score of 77 on an evaluation would not render a professor unfit for employment or retention with Talladega College. (Doc. 25-3 at 21).

Plaintiff submitted a formal complaint to the college regarding her nonrenewal. The complaint alleged racial and age discrimination and contended the timing of the nonrenewal violated Talladega College's policies. (Doc. 25-1 at 47-48). Regarding the timing of the nonrenewal, section 3.5.1 of the 2008 version

of the Faculty Handbook includes the following provision entitled "Non-Reappointment:"

> Notice of non-reappointment should be given in writing in accordance with the following standards:
>
> a.   not later than March 1 of the first academic year of service, if the appointment expires at the end of the year . . .;
>
> b.   not later than December 15 of the second academic year of service, if the appointment expires at the end of that year . . . .

(Doc. 25-4 at 4).[9]   The Faculty Handbook does not explicitly define what constitutes an "academic year of service."   Plaintiff contends that, due to her employment from April to May 2013, the 2013-14 academic year was her second year of service.   As Plaintiff would have it, the timing of any nonrenewal decision was governed by section 3.5.1.b. and required notice by December 15, 2013. Accordingly, Plaintiff argues her February 25, 2014 nonrenewal violated the Faculty Handbook.   In response to Plaintiff's internal complaint, Talladega College determined Plaintiff's five weeks of employment from April to May 2013 did not constitute an academic year.   (Doc. 25-1 at 48).   Accordingly, the College found the nonrenewal was governed by, and complied with, section 3.5.1.a.   (*Id.*).

---

[9] Talladega College revised the Faculty Handbook in 2013.   (*See* Doc. 24 at 14, n.7).   There is a dispute regarding whether the 2008 or 2013 version of the Faculty Handbook governed the 2013-14 academic year; Plaintiff contends it was the 2008 version.   (*See* Doc. 30-1 at 9).   This opinion assumes, without deciding, the 2008 version governed Plaintiff's employment and nonrenewal.

Talladega College did not hire a new Reading Specialist to replace Plaintiff for the 2014-15 academic year. (Doc. 24 at 15). Instead, Plaintiff's duties were assumed by the remaining Education Department faculty for the following year. (Doc. 30-1 at 16). Rebecca McKay, a 65-year-old white female filled the Reading Specialist position in September 2015 and, as of October 2016, was still employed in that capacity. (Doc. 24 at 15). Hawkins hired McKay on the recommendation of Edison and Long. (Doc. 24 at 15). In September 2014, Walker left the Education Department; he was replaced by Rebecca Robinson, a 61-year-old white female. (Doc. 24 at 15). Although Plaintiff acknowledged she had no knowledge regarding these subsequent hires, she testified to her belief that they were hired in order to cover-up her discriminatory termination. (Doc. 25-1 at 31). Plaintiff was hired in August 2016 for a temporary position as an Associate Professor of Education at Alabama A&M University. (Doc. 30-1 at 18).

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis

for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *See id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id*. at 249.

## III.  DISCUSSION

The Amended Complaint asserts claims for: (1) Hostile Work Environment on the basis of race and religion; (2) violations of the Age Discrimination in Employment Act; (3) racially and religiously discriminatory termination; (4) retaliation; and (5) breach of contract. (Doc. 14). In response to Talladega College's motion for summary judgment, Plaintiff abandoned hostile work

environment and ADEA claims. (Doc. 30-1 at 22 nn. 8-9). Based on the undisputed facts, there is no genuine issue of material fact and Talladega College is entitled to judgment as a matter of law on Plaintiff's abandoned claims. Plaintiff's remaining claims are addressed in turn.

## A. <u>Discriminatory Termination</u>

Because Plaintiff's discriminatory termination claims are based on circumstantial evidence, they are analyzed under the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004). To establish a prima facie case of discrimination, a plaintiff must show: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) she was replaced by a person outside her protected class or was treated less favorably than similarly-situated employees outside her protected class; and (4) she was qualified to do the job. *Maynard v. Bd. of Regents of the Div. of Univs. of the Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003).

After a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment decision. *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1227 (11th Cir. 1993). This burden involves no credibility determination, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993), and has been characterized as "exceedingly

light." *Perryman v. Johnson Prods. Co*., 698 F.2d 1138, 1142 (11th Cir. 1983). As long as the employer articulates "a clear and reasonably specific" non-discriminatory basis for its actions, it has discharged its burden of production. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981).

After an employer articulates one or more legitimate, nondiscriminatory reasons for the employment action, the plaintiff must show the proffered reason was a pretext for illegal discrimination. *Chapman v. AI Transp.,* 229 F.3d 1012, 1025 (11th Cir. 2000). If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must "meet that reason head on and rebut it." *Id.* at 1030. To demonstrate pretext, the plaintiff must show the proffered reason was false and that discrimination was the real reason for the employer's action. *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1163 (11th Cir. 2006).

Additionally, the court is mindful that in *Sims v. MVM, Inc.,* 704 F.3d 1327, 1333 (11th Cir. 2013), the Eleventh Circuit clarified that the *McDonnell Douglas* framework is not the only way for a plaintiff to survive summary judgment in a discrimination case. *See Smith v. Lockheed–Martin Corp*., 644 F.3d 1321, 1328 (11th Cir. 2011). Rather, "[t]he plaintiff will always survive summary judgment if [s]he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.* "A triable issue of fact exists if the record,

viewed in a light most favorable to the plaintiff, presents a 'convincing mosaic' of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision maker." *Id.*; *see Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012).

Here, the only element of Plaintiff's prima facie case in question is whether she was replaced by a person outside her protected class or was treated less favorably than similarly-situated employees outside her class. *See Maynard*, 342 F.3d at 1289. Plaintiff can satisfy this requirement by showing non-white Education Department professors were retained in similar circumstances. *See id.* Plaintiff disputes the versions of events offered by Talladega College to justify her nonrenewal; she testified and averred that she was not disruptive, noncompliant, or uncooperative. Accordingly, Plaintiff argues her employment should have been renewed, just as the employment of her black and non-Seventh Day Adventist colleagues was renewed. (Doc. 30-1 at 25).[10] For purposes of summary judgment, the court will assume, without deciding, Plaintiff has established her prima facie case.

Turning to the proffered reasons for Plaintiff's nonrenewal, Talladega relies on: (1) Edison's conclusions that Plaintiff failed to follow direction and Education

---

[10] Plaintiff also contends she was effectively replaced by the remaining three Education Department faculty who assumed her duties for the 2014-15 academic year until the Reading Specialist position was filled in 2015. (Doc. 30-1 at 24). Because the court will assume Plaintiff has established her prima facie case, analysis of this theory is not required.

Department standards; and (2) Long's conclusions that Plaintiff demonstrated a general lack of cooperation, failed to follow her supervisor's directions and State Education Department directives, and was the subject of at least one negative student evaluation. (Doc. 24 at 11-12). Thus, Talladega College has satisfied its "exceedingly light" burden of offering legitimate reasons for Plaintiff's nonrenewal. *Perryman*, 698 F.2d at 1142.

Accordingly, the burden shifts back to Plaintiff to demonstrate the reasons proffered by Talladega College to justify her nonrenewal were false and that discrimination was the real reason. *Brooks*, 446 F.3d at 1163. As already noted, Plaintiff has testified and averred that the proffered reasons were false. As to showing that discrimination was the real reason for her nonrenewal, Plaintiff relies on: (1) the untimeliness of the nonrenewal notice; (2) her testimony and declaration refuting the testimony of Long and Edison; and (3) Edison's and Long's statements and actions. Each argument is addressed in turn.

### 1.     Untimely Nonrenewal Notice

Plaintiff relies on her interpretation of the Faculty Handbook to support her contention that Talladega College's reasons for nonrenewal were pretext for discrimination. As noted above, Plaintiff asserts, because she worked for five weeks at the end of the 2012-13 academic year, the 2013-14 academic year was actually her second year of service. Accordingly, Plaintiff argues Talladega

College should have provided the notice of nonrenewal by December 15, 2013, under section 3.5.1.b. Since Plaintiff did not receive the notice of nonrenewal until February 25, 2014, she contends Talladega College violated the Faculty Handbook. (Doc. 30-1 at 26-27).[11] Without citing any authority, Plaintiff contends this renders all of the proffered reasons for nonrenewal "moot." (*Id.* at 27).

The Eleventh Circuit has held that "[a]n employer's deviation from its established policies may be evidence of pretext." *King v. Sec'y, US Dep't of the Army*, 652 F. App'x 845, 847 (11th Cir. 2016) (citing *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006)). However, cases examining this issue typically arise where the policy from which the employer deviated directly impacted the decision to terminate the employee. *See, e.g., Munoz v. Oceanside Resorts,* 223 F.3d 1340, 1345 n.5 (11th Cir. 2000) (termination following a single warning when the employee handbook outlined termination after three warnings); *Seals v. Lee Brass Foundry LLC*, 271 F. Supp. 3d 1302, 1325 (N.D. Ala. 2017) (denying summary judgement where employer did not follow its progressive discipline policy in firing employee). Here, the Faculty Handbook provision Plaintiff contends Talladega College violated did not provide the justification for her nonrenewal or affect the nonrenewal decision. Instead,

---

[11] Conversely, Talladega College contends the Faculty Handbook's mention of an academic year refers to consecutive Fall and Spring semesters. Accordingly, Talladega College argues the notice of nonrenewal was timely under section 3.5.1.a. Both interpretations are plausible.

Plaintiff describes a technical violation concerning only the timing of the notice of nonrenewal. Accordingly, it is doubtful this line of cases is applicable in this matter; the court has found no intra-circuit authority to support this theory, and Plaintiff has failed to cite any authority whatsoever in this regard.

Moreover, even if a technical deviation from a policy regarding the timing of a notice provision could provide evidence of pretext, the Eleventh Circuit has not held that policy violations constitutes pretext *per se*. Indeed, the Eleventh Circuit has found deviations from employer policies were insufficient to demonstrate pretext, including in cases where the termination decision itself violated the policy or the policy violation provided a basis for termination. *See N.L.R.B. v. Lampi, LLC*, 240 F.3d 931, 937 (11th Cir. 2001) (no pretext shown where employee handbook did not provide particular conduct would result in automatic termination); *Brown v. Northside Hosp.*, 311 F. App'x 217, 223 (11th Cir. 2009) (fact that employee handbook did not prohibit activity for which employee was terminated was insufficient to establish pretext).

Again, to show pretext, Plaintiff must show: (1) the reasons proffered by Talladega College to justify her nonrenewal were false; and (2) that discrimination was the real reason for nonrenewal. *Brooks*, 446 F.3d at 1163. Plaintiff's assertions regarding the arguably untimely notice of nonrenewal are probative of

neither. This conclusion is bolstered by Plaintiff's failure—discussed below—to provide sufficient evidence of Talladega College's discriminatory intent.

## 2. Refutation of Long's and Edison's Testimony

Plaintiff next contends, in light of her testimony and declaration refuting Long's and Edison's testimony, that Talladega College's proffered reasons for nonrenewal are unworthy of credence. (Doc. 30-1 at 27). It is true that, under the summary judgment standard, competing versions of events are resolved in the non-movant's favor. However, to show pretext, a plaintiff must show, not only that the defendant's proffered reasons are untrue, but also that discrimination was the real reason for termination. *Brooks*, 446 F.3d at 1163. Merely refuting an employer's testimony is insufficient to show discriminatory intent. *See Tift v. Hubbell Power Sys., Inc.*, No. 12-1684-KOB, 2013 WL 4045379, at *13 (N.D. Ala. Aug. 7, 2013) (plaintiff's denial of the facts supporting employer's proffered reasons for termination "only creates a genuine issue of material fact if he also presents evidence that illustrates [the employer's] discriminatory intent"); *Conner-Goodgame v. Wells Fargo Bank, N.A.*, No. 2:12-CV-03426-IPJ, 2013 WL 5428448, at *9 (N.D. Ala. Sept. 26, 2013) (refutation of movant's facts insufficient to show pretext); *see also Bassano v. Hellmann Worldwide Logistics, Inc.,* 310 F. Supp. 2d 1270, 1280 (N.D. Ga. 2003) ("Plaintiff's personal belief that Defendant unlawfully discriminated against her, no matter how strongly held, cannot create a

genuine issue of pretext when that belief is unsupported by any evidence in the record."); *Nix v. WLCY Radio/Rahall Commc'ns.,* 738 F.2d 1181, 1187 (11th Cir. 1984) ("The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.").

Accordingly, while dueling testimony is decided in Plaintiff's favor, she must also show discriminatory intent to establish pretext. As discussed below, Plaintiff has failed to present evidence of Talladega College's discriminatory intent.

### 3. Long's and Edison's Actions and Statements

Finally, Plaintiff relies on specific actions and statements by Long and Edison as evidence that her nonrenewal was motivated by racial and religious discrimination. (Doc. 30-1 at 28). Each variety of discrimination is addressed.

#### a. Race

As to racial discrimination, Plaintiff generally contends her statement of facts presents "objective evidence of disparate treatment toward the plaintiff compared to the treatment Long and Edison afforded to black faculty members in the education department." (Doc. 30-1 at 28). The only specific incident Plaintiff relies upon to support her claim of racial discrimination is Long's statement that she would have "to decide if she would let [Plaintiff] teach other people's

children." (*Id.*).  Plaintiff contends this "can reasonably be construed to be a racist comment." (*Id.*).

To the extent Plaintiff generally contends the record supports a conclusion that she suffered disparate treatment compared to her black colleagues, the statement of facts is virtually devoid of any specific instance in which any Talladega College employee—other than Plaintiff—even referred to race, much less did so in a discriminatory fashion.  The one exception is Plaintiff's testimony that, during Walker's interview, Edison stated "she wanted [to hire] a black male." (Doc. 25-1 at 30).  Even assuming Plaintiff's testimony in this regard is accurate, Edison's comment was made in conjunction with Walker's hiring, in the Spring of 2013.  Moreover, Edison made this statement entirely separately from: (1) her December 2013 recommendation that Plaintiff not be renewed; and (2) Talladega College's February 25, 2014 notice of nonrenewal.

The foregoing statement is the only instance of overtly racially discriminatory conduct in Plaintiff's statement of facts.  Standing alone, Edison's comment is insufficient to establish pretext.  *See Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227-30 (11th Cir. 2002) (a racially derogatory comment, even by an employee's direct supervisor, that is unrelated to the adverse employment action is insufficient to establish pretext on its own); *White v. Crystal Mover Servs., Inc.*, 675 F. App'x 913, 916 (11th Cir. 2017), *cert. denied,* 137 S. Ct.

2148 (2017) (affirming summary judgment for employer where, in the absence of other evidence of pretext, "three isolated racial comments that were not connected to the [plaintiff's] promotion decision cannot establish pretext").

Indeed, the record here reveals only that Plaintiff subjectively believes Edison and Long discriminated against her. Regarding the Finger Print Confrontation, Plaintiff acknowledged Edison never referred to race but testified she "*fel*[*t*] *like*" or "*believed*" Edison used racially derogatory language "behind [her] back." (Doc. 25-1 at 18) (emphasis added). Plaintiff further testified she "*consider*[*ed*]" Edison's actions during the Fingerprint Confrontation to be racially motivated because "[i]t was a black woman yelling at a white woman." (*Id.*) (emphasis added). Regarding the Syllabus Complaint, Plaintiff *interpreted* Edison's refusal to answer her students' questions to be racially discriminatory because Plaintiff *believed* Edison would have answered questions from a black professor's students. (Doc. 25-1 at 15).

Regarding the Scanner Misspelling, Plaintiff testified she *believed* Edison purposefully misspelled her name as a form of racial discrimination because Edison was "very ugly" to Plaintiff. (Doc. 25-1 at 15). When Long delivered the notice of nonrenewal and said "have a nice day," Plaintiff *felt* Long's statement was "racial." (Doc. 30-1 at 21). Similarly, Plaintiff testified she *believed* the following incidents were racially discriminatory because Long and Edison are members of a

racial group to which Plaintiff does not belong: (1) Edison would "talk over" her in meetings with Long; (2) Edison sent email complaints to Long regarding Plaintiff; and (3) Edison told another employee she did not want to sit next to Plaintiff. (Doc. 25-1 at 18, 29). Finally, Plaintiff *considered* it a form of racial discrimination that student files were stored in Walker's office and Edison refused to move the files to a different location. (Doc. 25-1 at 30). Plaintiff's subjective belief that Long and Edison engaged in racial discrimination is insufficient to establish pretext. *See Bassano*, 310 F. Supp. 2d at 1280 ("Plaintiff's personal belief that Defendant unlawfully discriminated against her, no matter how strongly held, cannot create a genuine issue of pretext when that belief is unsupported by any evidence in the record.").

The same is true to the extent Plaintiff relies on Long's statement regarding whether Plaintiff could teach other people's children—the only specific example of supposed racial discrimination cited in Plaintiff's argument regarding pretext. (*See* Doc. 30-1 at 28). Nothing about Long's statement constitutes evidence of racial discrimination. It is clear Plaintiff construed this—and many other facially race-neutral statements—as discriminatory because Plaintiff is white while Long and Edison are black. (Doc. 25-1 at 18, 29). That Plaintiff believed she was subject to racial discrimination is further evidenced by her description of her departmental colleagues as Talladega College's "black pet[s]" or "little black people." (Doc. 25-

1 at 17, 36).  But again, Plaintiff's subjective belief that discrimination occurred is insufficient to establish pretext.  *See Bassano*, 310 F. Supp. 2d at 1280.

b.  Religion

As to religious discrimination, Plaintiff relies on the fact that Edison knew Plaintiff was a Seventh Day Adventist and argues Edison's December 2013 email can reasonably be construed as discriminating against Plaintiff's faith.  (Doc. 30-1 at 28).  Because the email in question was temporally proximate to Edison's recommendation of nonrenewal—and because Long gave "great weight" to the recommendation—Plaintiff contends her termination was motivated by religious discrimination.  (*Id.*).

Edison's December 19, 2013 email to Plaintiff was a reply to Plaintiff's objections to registering—and requiring students to register—with the SPLC website to complete the Teaching Tolerance exercise.[12]  Plaintiff's concerns were based on her contention that the SPLC was "actively promoting the gay agenda." Edison's response began with a recitation of Talladega College's nondiscrimination policy, including its prohibition on discrimination based on sexual orientation, disability, or religion.  Although Plaintiff does not identify the specific portion of

_____

[12] The record does not reveal the timing of Edison's recommendation of nonrenewal vis à vis Plaintiff's December 17, 2013 email regarding the Teaching Tolerance exercise.  Edison testified she could not remember precisely when she wrote the letter to Long recommending nonrenewal but stated it was in December at the end of the Fall semester.  (Doc. 25-3 at 6-7).  Edison's recommendation of nonrenewal does not appear on the record.

Edison's response demonstrating religious animus, she presumably relies on the second sentence, in which Edison wrote:

> This term you have expressed deep concerns about the Church of Scientology, what people eat, individuals with disabilities and now sexual orientation. In each instance I could not find where the information provided or the individual involved was at odds with the mission of this institution, the State standards or Alabama law.

(Doc. 25-1 at 45). Plaintiff does not explain her rationale for contending this response evidences Edison's religious discrimination against Seventh Day Adventism. The undersigned can discern two religious—or potentially religious—references in Edison's response: Plaintiff's concerns about Scientology and, more tangentially, "what people eat."

To the extent Plaintiff may rely on the reference to her concerns about the Church of Scientology, it makes no reference to Plaintiff's Seventh Day Adventist faith. To the extent Plaintiff relies on the email to show Edison's distribution of "The Way to Happiness" materials somehow singled-out Plaintiff because she is a Seventh Day Adventist, the attempt fails. The undisputed facts establish: (1) Edison did not know the "The Way to Happiness" publications were distributed by a group affiliated with the Church of Scientology; (2) Edison gave the booklets to each member of the Education Department faculty; and (3) Plaintiff did not read the booklet. None of this supports an inference that Edison discriminated against

Plaintiff's faith, much less that she recommended Plaintiff's nonrenewal because of her religion.

It appears Plaintiff also may rely on her testimony that she interpreted Edison's statements as "bragging that those Scientology posters are still posted on Talladega College campus." (Doc. 25-1 at 21; *see* Doc. 30-1at 21). However, Plaintiff's testimony does not establish that Edison hung any posters on campus; rather, Plaintiff only testified that she thought Edison did so. (Doc. 25-1 at 21). Edison's unrebutted testimony is that she gave the posters to another Talladega College employee who displayed them in a student center, located in a different building on campus. (Doc. 25-3 at 11, 16).

To the extent Plaintiff may rely on the email's reference to her concerns about "what people eat:" (1) Edison knew Plaintiff was a vegetarian based on departmental events where food was served and Plaintiff's statements that meat defiles the body; (2) Edison knew Plaintiff was a Seventh Day Adventist because Plaintiff told her; and (3) when Plaintiff told Edison she was a Seventh Day Adventist, Edison stated the Seventh Day Adventists she knew were vegetarians. The court is unable to determine the inferential leaps required to show Edison's reference to Plaintiff's concerns about people's diets was indicia of Edison's animus toward Plaintiff's religion. Plaintiff's subjective belief that she suffered religious

discrimination is insufficient to show pretext. *See Bassano*, 310 F. Supp. 2d at 1280.

For the foregoing reasons, Plaintiff is unable to satisfy the *McDonnell Douglas* framework regarding her termination claims. Additionally, the facts viewed in the light most favorable to Plaintiff do not present a "convincing mosaic" of circumstantial evidence evincing Talladega College's discriminatory practices. Accordingly, Plaintiff's termination claims cannot survive summary judgment under *Sims,* 704 F.3d at 1333, or *Smith*, 644 F.3d at 1328

**B.    <u>Retaliation</u>**

As in the discrimination context, where proof of retaliatory intent is offered by way of circumstantial evidence, courts apply a burden-shifting scheme analogous to the *McDonnell Douglas* framework outlined above. *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997); *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1162-63 (11th Cir. 1993). If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Goldsmith*, 996 F.2d at 1163. Once the employer proffers a legitimate reason for the adverse employment action, the burden shifts back to the plaintiff to show the legitimate reason was pretext for prohibited retaliatory conduct. *Id.*

### 1.    Prima Facie Case of Retaliation

To establish a Title VII retaliation claim based on circumstantial evidence, Plaintiff must show: (1) she engaged in statutorily protected expression; (2) she suffered a materially adverse employment action; and (3) there is a causal connection between the two events.  *See Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).  As explained below: (1) Plaintiff's complaints regarding The Way to Happiness materials is her only potentially statutorily protected expression; and (2) Plaintiff has failed to establish a causal connection between that complaint and her nonrenewal.

Statutorily protected expression is not limited to formal complaints, but extends to those "who informally voice complaints to their superiors or who use their employers' internal grievance procedures."  *Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989).  To constitute statutorily protected expression, a plaintiff's complaint must meet two requirements: (1) "it must put the employer on notice that the plaintiff is opposing a practice made unlawful by Title VII by explicitly or implicitly conveying a belief that the practice constitutes unlawful employment discrimination;" and (2) "the complaint must be based on a 'good faith reasonable belief' that the plaintiff's employer engaged in unlawful discrimination, but the plaintiff need not actually establish an underlying discrimination claim."  *Posey v. O'Reilly Auto. Stores, Inc.*, No. 12-4135-KOB,

2014 WL 3809957, at *11 (N.D. Ala. July 31, 2014) (citing *Murphy v. City of Aventura,* 383 F. App'x 915, 918 (11th Cir. 2010), and quoting *Lipphardt v. Durango Steakhouse of Brandon, Inc.,* 267 F.3d 1183, 1187 (11th Cir. 2001)).

For purposes of summary judgment, the court will assume without deciding Plaintiff satisfied the second requirement as to all her claims.[13]  However, only the conversation with Edison regarding The Way to Happiness materials arguably put her on notice that Plaintiff was opposing any form of discrimination.  As to the incidents Plaintiff construed as racial discrimination, none of her informal complaints regarding the incidents included any reference to race.  Plaintiff contends Long and Edison "should have recognized her complaints" as alleging race discrimination because she complained "about being treated less favorably than faculty members who were black."  (Doc. 30-1 at 29).  However, Plaintiff never actually communicated her belief that her unfavorable treatment had anything to do with her—or anyone else's—race.  Plaintiff contends her "frequent if not constant [complaints] alleged the type of hostile conduct by Edison towards Nielsen which, if true, could only be explained by racial animus or race discrimination."  (Doc. 30-1).  As a matter of law, Plaintiff's race-neutral complaints about work-place annoyances do nothing of the sort.  An unpleasant

---

[13] Plaintiff clearly believed Talladega College was constantly engaging in numerous forms of discrimination.  Whether Plaintiffs beliefs in this regard qualify as good-faith or reasonable is questionable.

interaction with a coworker or supervisor is not transformed to racial discrimination merely because the combatants are members of different races. Under Plaintiff's theory, any disagreement she had with any of member of the Education Department would be racially discriminatory because she was the only white faculty member.

The only event that could potentially have put anyone on notice that Plaintiff was alleging discrimination was her complaint regarding The Way to Happiness materials. It is arguable whether this even constitutes a complaint. Plaintiff did not complain directly to Edison—or follow any other internal grievance procedure—regarding the booklets, which Edison gave to all Education Department faculty and which Plaintiff did not read. The same is true regarding the posters, which Edison gave to another Talladega College employee who, in turn, hung them in a different building on campus. Instead, Edison only learned of Plaintiff's complaints regarding The Way to Happiness when she heard it through the grapevine from another Talladega College employee. After hearing of Nielson's complaints Edison spoke with Plaintiff about her concerns. Plaintiff contends Edison "berated" her and was yelling. (Doc. 25-1 at 21). So while Plaintiff did not initiate the complaint regarding the Way to Happiness, Edison knew Plaintiff was complaining about what she saw as Edison's promotion of Scientology.

However, Plaintiff must also show causation between her complaint regarding The Way to Happiness and her nonrenewal; she has failed to do so. As the Supreme Court observed in *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013), "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e–2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id*. In other words, a plaintiff making a Title VII retaliation claim "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Id*. at 362.

Plaintiff provides no argument as to how her conversation with Edison regarding The Way to Happiness—or Long's knowledge of it—was the but-for cause of her nonrenewal. Plaintiff does not make any argument regarding the temporal proximity of these events to her nonrenewal; nor does the timing appear on the record. Plaintiff appears to rely on the temporal proximity of Edison's December 17, 2013 email regarding the Teaching Tolerance exercise to her recommendation of nonrenewal. However, Plaintiff's only thrust in this regard is that "[t]he timing of the December 2013 email and Edison's letter to Long recommending non-reappointment are very close" and that Long gave "great weight" to the recommendation. (Doc. 30-1 at 28). Close temporal proximity is

only probative of causation if the protected activity precedes the adverse employment action. As previously noted, the record is silent regarding the sequence of these events.

However, even if Edison's recommendation of nonrenewal immediately followed the Teaching Tolerance events, it would not establish causation. As noted in section III.A.3.b., this email is insufficient to show religious discrimination or that Plaintiff was complaining about religious discrimination. The only facts on the record clearly demonstrate Edison construed Plaintiff's complaint as based on the SPLC's stance on issues surrounding sexual orientation. Plaintiff does not argue that the SPLC's promotion of the "gay agenda" in any way violated her religious beliefs. Accordingly, the exchange regarding Teaching Tolerance does not establish Plaintiff's nonrenewal was retaliation for complaining of religious discrimination; Plaintiff has failed to demonstrate the requisite "but-for" causation to establish a prima facie case of retaliation.

## 2. Pretext

Even if Plaintiff could establish a prima face case of retaliation, she cannot establish Talladega College's stated reasons for her nonrenewal were pretext for retaliation. For the reasons discussed in section III.A.3.b., Plaintiff has not presented evidence showing Talladega College's stated reasons for nonrenewal were a pretext to hide a discriminatory or retaliatory motive.

For all of the foregoing reasons, there are no genuine issues of material fact, and Talladega College is entitled to judgment as a matter of law regarding Plaintiff's claim for retaliation.

## C.    Breach of Contract

Finally, Plaintiff contends Talladega College's arguably untimely notice of nonrenewal under section 3.5.1. of the Faculty Handbook constitutes a breach of contract.  (Doc. 30-1 at 30).  Alabama is an "employment-at-will" state.  *Ex parte Michelin N. Am., Inc.*, 795 So. 2d 674, 677 (Ala. 2001).  As such, an "employment relationship is ordinarily 'at will,'" meaning it "is terminable by either party at any time for any reason."  *Id.* (citing *Hoffman-LaRoche, Inc. v. Campbell*, 512 So. 2d 725, 728 (Ala. 1987); *Hinrichs v. Tranquilaire Hosp.*, 352 So. 2d 1130, 1131 (Ala. 1977)).  The Alabama Supreme Court has held provisions of an employee handbook can constitute a binding unilateral employment contract in certain circumstances:

> To become a binding promise, the language used in the handbook must be specific enough to constitute an actual offer rather than a mere general statement of policy.  However, whether a proposal is meant to be an offer is determined by the outward manifestations of the parties, rather than their uncommunicated beliefs.

*Hoffman-LaRoche*, 512 So. 2d at 733-34 (citations omitted); *see also Williams v. Gen. Elec.*, 13 F. Supp. 3d 1176, 1181 (N.D. Ala. 2014).

Here, the employment letter Plaintiff signed noted her position at Talladega College was "at will" and could be terminated at any time, without cause or notice, and at the sole discretion of Talladega College. (Doc. 25-4 at 11; Doc. 25-1 at 44). Meanwhile, Plaintiff relies on section 3.5.1. of the Faculty Handbook, which states notice of nonrenewal "*should*" be given by one of two dates. (Doc. 25-4 at 4) (emphasis added). If the employee is in her first academic year of service, Talladega College should give written notice of nonrenewal by March 1. If the employee is in her second academic year of service, Talladega College should give written notice of nonrenewal by December 15. (*Id.*). Plaintiff contends the employment letter governs the plaintiff's employment, while the Faculty Handbook governs non-reappointment for the following year. (Doc. 30-1 at 30).

The outward manifestation of Talladega College in the executed employment letter explicitly and specifically states Plaintiff's position was at-will. In the face of this explicit outward manifestation of the nature of Plaintiff's position, Plaintiff relies on a portion of the Faculty Handbook describing when Talladega *should* give any notice of nonrenewal. To state these undisputed facts is to reach the conclusion as a matter of Alabama law. Section 3.5.1 is merely Talladega College's "general statement of policy." *Hoffman-LaRoche*, 512 So. 2d at 734. The policy regarding the timing of nonrenewal is not sufficiently specific to constitute an actual offer. *See id.* For instance, the policy does not state an

employee will be automatically renewed if notice is not provided in a timely manner. In short, the policy is not sufficiently specific to overcome the explicitly at-will nature of Plaintiff's employment.

Moreover, as Talladega College asserts, Plaintiff's argument suffers from another fatal flaw. In addition to the at-will nature of Plaintiff's position, the employment letter also explicitly and specifically states Plaintiff could be terminated at any time, for any reason, at Talladega College's discretion. While Plaintiff was not fired—her employment simply was not renewed for the following year—Talladega College could fire her at any time. Thus, under the "contract" Plaintiff envisions, Talladega College would be required to renew her employment for the 2014-15 academic year but could fire her for any reason at any time. This scenario is not only logically problematic; it also makes it difficult to envision how Plaintiff could prove damages to sustain her breach of contract claim.

For all of the foregoing reasons, there are no genuine issues of material fact, and Talladega College is entitled to judgment as a matter of law regarding Plaintiff's claim for breach of contract.

## IV.  CONCLUSION

For the foregoing reasons, there are no genuine issues of material fact, and Talladega College is entitled to judgment as a matter of law on all claims asserted

in Plaintiff's Amended Complaint. Accordingly, Defendant's motion for summary

judgment is due to be granted. (Doc. 23). A separate order will be entered.

**DONE** this 15th day of March, 2018.

STACI G. CORNELIUS
U.S. MAGISTRATE JUDGE